# Exhibit A

1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  JAMES I. JACONETTE (179565)
   DANIELLE S. MYERS (259916)
3  655 West Broadway, Suite 1900
   San Diego, CA 92101-8498
4  Telephone: 619/231-1058
   619/231-7423 (fax)
5
   ROBBINS GELLER RUDMAN
6  SHAWN A. WILLIAMS (213113)
     & DOWD LLP
7  Post Montgomery Center
   One Montgomery Street, Suite 1800
8  San Francisco, CA 94104
   Telephone: 415/288-4545
9  415/288-4534 (fax)

10 Attorneys for Plaintiff

11 [Additional counsel appear on signature page.]                    **File By Fax**

12                SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                          COUNTY OF SAN MATEO

14 CITY OF WARREN POLICE AND FIRE          )  <u>VIA FAX</u>
   RETIREMENT SYSTEM, Individually and on  )
15 Behalf of All Others Similarly Situated, )  Case No.   C I V 5 3 7 4 0 9
                                            )
16                              Plaintiff,  )  <u>CLASS ACTION</u>
                                            )
17              vs.                         )  COMPLAINT FOR VIOLATIONS OF THE
                                            )  SECURITIES ACT OF 1933
18 NATERA, INC.,                            )
   MATTHEW RABINOWITZ,                      )
19 HERM ROSENMAN,                           )
   JONATHAN SHEENA,                         )
20 ROELOF F. BOTHA,                         )
   TODD COZZENS,                            )
21 EDWARD C. DRISCOLL, JR.,                 )
   JAMES I. HEALY,                          )
22 JOHN STEUART,                            )
   SEQUOIA CAPITAL XII, LP,                 )
23 SC XII MANAGEMENT, LLC,                  )
   LIGHTSPEED VENTURE PARTNERS VIII,        )
24   LP,                                    )
   LIGHTSPEED ULTIMATE GENERAL             )
25   PARTNER VIII, LTD.,                    )
   MORGAN STANLEY & CO. LLC,                )
26                                          )
27 _____ )  <u>DEMAND FOR JURY TRIAL</u>

28 [Caption continued on following page.]

                COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1

2    COWEN AND COMPANY, LLC,                )
     PIPER JAFFRAY & CO.,                    )
3    ROBERT W. BAIRD & CO. INCORPORATED, )
     WEDBUSH SECURITIES INC. and             )
4    DOES 1-25, inclusive,                   )
                                             )
5                        Defendants.         )
                                             )
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Plaintiff City of Warren Police and Fire Retirement System ("plaintiff"), individually and on

2    behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint

3    against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's

4    own acts, and upon information and belief as to all other matters, based on the investigation conducted

5    by and through plaintiff's attorneys, which included, among other things, a review of Natera, Inc.

6    ("Natera" or the "Company") press releases, Securities and Exchange Commission ("SEC") filings,

7    analyst and media reports and other commentary analysis, and information concerning Natera and the

8    industry within which it operates.  Plaintiff's investigation into the matters alleged herein is continuing

9    and many relevant facts are known only to, or are exclusively within the custody and control of, the

10   defendants.   Plaintiff believes that substantial additional evidentiary support will exist for the

11   allegations set forth herein after a reasonable opportunity for formal discovery.

12                              **NATURE AND SUMMARY OF THE ACTION**

13       1.      This is a securities class action for violations of §§11, 12(a)(2) and 15 of the Securities

14   Act of 1933 (the "Securities Act") on behalf of all purchasers of Natera common stock in and/or

15   traceable to the Company's July 2, 2015 initial public offering ("IPO") against (1) Natera; (2) certain of

16   Natera's senior executives and directors who signed the June 1, 2015 Registration Statement issued in

17   connection with Natera's IPO of 10.9 million shares of common stock (including exercise of the over-

18   allotment) (the "Offering"); (3) certain controlling entities of Natera that owned approximately 31% of

19   the Company's outstanding securities; and (4) each of the underwriters of the Offering.  Plaintiff alleges

20   that the Registration Statement and Prospectus incorporated therein (collectively, the "Registration

21   Statement") issued in connection with the IPO contained materially incorrect or misleading statements

22   and/or omitted material information that was required to be disclosed.  Natera is strictly liable for such

23   misstatements and omissions therefrom, and so too are the defendants who signed the Registration

24   Statement liable, as well as the underwriters and controlling entities and persons.  Plaintiff expressly

25   disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

26       2.      Natera is a leading genetic testing company that develops and commercializes non-

27   invasive methods for analyzing DNA.  Natera's primary product is Panorama, a non-invasive prenatal

28   test ("NIPT"), launched in March 2013, which the Company claims is the "most accurate NIPT

1   commercially available in the United States." Natera went public on July 2, 2015 at an IPO price of

2   $18 per share, and quickly traded up to close its first day of public trading at $22.74 per share. The

3   Company's common stock is listed and trades on the NASDAQ stock exchange under the ticker symbol

4   "NTRA."

5         3.      Unfortunately for Natera's new investors, however, the offering materials falsely and

6   misleadingly represented the state of Natera's business, including that Natera had experienced a nearly

7   $20 million net loss in the Company's second quarter 2015 ("2Q15") – which had ended before the IPO

8   – and which loss exceed any other quarterly loss the Company had suffered by as much as 3700% since

9   at least 2Q13 when Panorama was released. In addition, Natera had experienced a 2Q15 revenue

10   decline, which was also the second quarter in a row of declining revenue – contrary to the state of

11   Natera's business depicted in the Registration Statement. In fact, Panorama tests accessioned in which

12   revenue was recognized had already flat-lined at 28,000+ tests, and the percent of Panorama tests

13   accessioned in which revenue was recognized in the same quarter had dramatically declined to a mere

14   47%, far below the percentage in prior quarters, indicating bleak prospects for the Company's principal

15   product – far from what was portrayed in the Registration Statement and roadshow for the Offering.[1]

16         4.      At the time of the filing of this action, Natera stock was trading in the range of $6.50-

17   $7.00 per share, or less than **half** of the IPO price, having plummeted in response to information

18   reflecting the materialization of significant risks misrepresented and omitted from the Registration

19   Statement as alleged herein.

20   **JURISDICTION AND VENUE**

21         5.      This Court has subject matter jurisdiction over this action pursuant to the California

22   Constitution, Article VI, §10, and §22 of the Securities Act, 15 U.S.C. §77v. Section 22 of the

23   Securities Act expressly states that "[e]xcept as provided in section 16(c), no case arising under this title

24   and brought in any State court of competent jurisdiction shall be removed to any court of the United

25   States." Section 16(c) refers to "covered class action[s] brought in any State court involving a covered

26   security, as set forth in subsection (b);" and subsection (b) of §16 in turn includes within its scope only

27   
28   

---

[1]   A test is accessioned when Natera receives the test, the relevant information about the test is entered into its computer system and the test sample is routed into the appropriate sample flow.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  covered class actions "based upon the statutory or common law of any State or subdivision thereof."
2  *See* 15 U.S.C. §77p.  This action only asserts federal law claims under §11, §12(a)(2) and §15 of the
3  Securities Act.  *See* 15 U.S.C. §77k, §771(a)(2), and §77o.  Consequently, this action is not removable
4  to federal court.  *See Kircher v. Putnam Funds Trust*, 547 U.S. 633, 643-44 (2006); *Madden v. Cowen*
5  *& Co.*, 576 F.3d 957, 965 (9th Cir. 2009); *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d
6  1031, 1033-34 (9th Cir. 2008).

7         6.       This Court has personal jurisdiction over each defendant named herein because each
8  conducted business in, resided in, and/or was a citizen of California at the time of the Offering.

9         7.       Venue is proper in this Court because many of the acts complained of, including the
10 preparation and dissemination of the materially inaccurate, misleading and incomplete Registration
11 Statement and Prospectus (which were prepared by defendants, or with their participation,
12 acquiescence, encouragement, cooperation and/or assistance), occurred in whole or in substantial part in
13 this County.  Natera's headquarters is in this County and eight additional defendants, including three
14 individual defendants, reside or have offices in this County.

15                                            **PARTIES**

16        8.       Plaintiff City of Warren Police and Fire Retirement System purchased shares of Natera
17 common stock in the Offering, and was damaged thereby.

18        9.       Defendant Natera issued the securities sold in the IPO and is a Delaware corporation
19 with principal executive offices in San Mateo County at 201 Industrial Road, San Carlos, California.
20 Natera is subject to liability as an issuer and control person, and all the statements and solicitation
21 herein made by Natera's officers were on behalf of Natera.  Natera designated numerous personnel on
22 the working group for the IPO, including its Chief Executive Officer ("CEO"), Chief Technology
23 Officer ("CTO"), and Chief Financial Officer ("CFO"), all of whom not only reviewed and approved
24 the offering documents, but also traveled in a roadshow, and gave roadshow presentations according to
25 a power point and talking points/script that was reviewed and approved by them and other Natera
26 personnel.  Natera's representatives at the roadshow pitched investors in the IPO in webcasts and
27 meetings.

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

10.     Defendant Matthew Rabinowitz is a co-founder and President of Natera and has served as CEO since 2005 and as Chairman since May 2015.  As one of three Natera executives in the IPO working group, Rabinowitz reviewed and approved, and participated in making, statements in the Registration Statement.  He also reviewed, edited and approved the IPO's roadshow powerpoint presentation and roadshow talking points and script, in addition to participating in making the false and misleading statements at the roadshow as Natera's CEO.  Rabinowitz was motivated by the financial implications of an IPO for Natera and its then-private shareholders, including (but not limited to) officers and employees of the Company.  Immediately before the IPO, defendant Rabinowitz beneficially owned over 5.7 million Natera shares, providing him with 11.5% voting control after the IPO and over $104 million in marketable securities as of the close of the IPO.  Those securities included over 1.2 million shares of Series A-1 Preferred Stock that automatically converted to Natera common stock on a one-for-one basis immediately prior to the close of the IPO.  Those securities also included options for over 2.1 million underlying marketable common shares, with exercise prices between $0.55 and $5.39 per share, that vested in connection with or at or about the time of the IPO, and that were "in-the-money" with an intrinsic value of approximately $33 million as of the IPO's close.

11.     Defendant Jonathan Sheena is a co-founder of Natera and has served as CTO and a director since 2007.  As one of three Natera executives in the IPO working group, Sheena reviewed and approved, and participated in making, statements in the Registration Statement.  He also reviewed, edited and approved the IPO's roadshow powerpoint presentation and roadshow talking points and script, in addition to participating in making the false and misleading statements at the roadshow as Natera's CTO.  Sheena was motivated by the financial implications of an IPO for Natera and its then-private shareholders, including (but not limited to) officers and employees of the Company.  Immediately before the IPO, defendant Sheena beneficially owned over 1.8 million Natera shares, providing him with 3.7% voting control after the IPO and with over $33.4 million in marketable securities as of the close of the IPO.  Those securities included options for over 1.2 million underlying marketable common shares, with exercise prices between $0.44 and $2.65 per share, that were fully vested at or about the time of the IPO, and that were "in-the-money" with an intrinsic value of over $20 million as of the IPO's close.

12.     Defendant Herm Rosenman has served as Natera's CFO since February 2014. As one of three Natera executives in the IPO working group, Rosenman reviewed and approved, and participated in making, statements in the Registration Statement. He also reviewed, edited and approved the IPO's roadshow powerpoint presentation and roadshow talking points and script, in addition to participating in making the false and misleading statements at the roadshow as Natera's CFO. Rosenman was motivated by the financial implications of an IPO for Natera and its then-private shareholders, including (but not limited to) officers and employees of the Company. Immediately before the IPO, defendant Rosenman beneficially owned Natera options for over 138,000 underlying marketable common shares with exercise prices of $2.65 per share and an intrinsic value of over $2.1 million as of the IPO's close.

13.     Defendant Roelof F. Botha has been a Natera director since 2007. Defendant Botha is also Natera's Lead Independent Director and a member of Natera's Audit Committee and Nominating and Corporate Governance Committee. Immediately prior to the IPO, defendant Botha beneficially owned over 7.7 million, or approximately 20%, of Natera's outstanding shares. Those shares largely consisted of Series A through Series E Preferred Stock, all of which converted to publicly tradable common stock on a one-for-one basis in connection with and immediately prior to the closing of the IPO. All of these shares, constituting over $139 million in marketable securities as a result of the IPO, were held by limited partnerships affiliated with the Sequoia Capital venture capital firm. Botha is affiliated with Sequoia Capital, and is a Managing Member of defendant SC XII Management, LLC, the general partner of defendant Sequoia Capital XII, LP and affiliated limited partnerships, and has (and had at the time of the IPO) shared voting and dispositive power over the 7.7 million-plus shares held by those limited partnerships. Botha does business out of Sequoia Capital offices in San Mateo County.

14.     Defendant Todd Cozzens has been a Natera director since 2011. Defendant Cozzens is also a member of Natera's Audit Committee and Compensation Committee. Cozzens was with Sequoia Capital, the venture capital firm holding approximately 20% of Natera's outstanding shares as of the IPO. Defendant Cozzens beneficially owned options for over 80,000 underlying marketable common shares with exercise prices of $1.38 per share and an intrinsic value of over $1.3 million as of the IPO's close.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

15.    Defendant Edward C. Driscoll, Jr., also known as "Ted Driscoll," has been a Natera director since 2007.  Defendant Driscoll is also a member of Natera's Nominating and Corporate Governance Committee.  Since 2006, defendant Driscoll has been with Claremont Creek Ventures, a venture capital firm that held and controlled approximately 19% of Natera's voting shares as of the IPO, and he sourced and led the financing of Natera pre-IPO.  Driscoll resides in San Mateo County.

16.    Defendant James I. Healy has been a Natera director since November 2014.  Defendant Healy is also a member of the Compensation Committee and Nominating and Corporate Governance Committee.  Immediately prior to the IPO, defendant Healy beneficially owned over 2.3 million, or approximately 6%, of Natera's outstanding shares.  Those shares largely consisted of Series F Preferred Stock, all of which converted to publicly tradable common stock on a one-for-one basis in connection with and immediately prior to the closing of the IPO.  All of these shares, constituting over $41 million in marketable securities as a result of the IPO, were held by limited partnerships affiliated with the Sofinnova venture capital firm.  Defendant Healy is affiliated with Sofinnova, and is a managing member of each of Sofinnova Management VIII, L.L.C. and Sofinnova Management IX, L.L.C., the general partners of Sofinnova Venture Partners VIII, L.P. and Sofinnova Venture Partners IX, L.P., respectively.  Those limited partnerships each held approximately 1.2 million shares of Natera stock as of the IPO, and Healy has (and had at the time of the IPO) shared voting and dispositive power over those shares.

17.    Defendant John Steuart has been a Natera director since June 2007.  Defendant Steuart is also a member of Natera's Audit Committee and Compensation Committee.  Defendant Steuart co-founded Claremont Creek Ventures, the venture capital firm that held approximately 19% of Natera's shares as of the IPO, and he was a Managing Director at that firm from 2004 to July 2012.

18.    The defendants named in ¶¶10-17 are sometimes referred to herein as the "Individual Defendants."  The Individual Defendants each participated in the preparation of and signed the Registration Statement for the IPO.  Their participation in the solicitation of the IPO, through preparation and approval of the offering documents, was motivated by each of their financial interests in the Company that were served by the IPO, and each of them financially benefited from the IPO in numerous ways, including by substantially increasing the book value of Natera and the Individual

Defendants' shares and by providing a liquid market in which to sell their shares upon the exercise of in-the-money options or otherwise. Indeed, the employee stock options held by the defendants were valued in anticipation of an IPO. Natera's directors and executive officers and their affiliates beneficially owned more than 34% of the Company's outstanding stock after the IPO. In addition, the defendants referenced above in ¶¶10-12 are executives of Natera and approved and participated in making statements to pitch potential investors in the roadshow to sell the IPO. Natera and the Individual Defendants who signed the Registration Statement are strictly liable for the false and misleading statements incorporated into the Registration Statement.

19. Defendant SC XII Management, LLC is part of a venture capital firm that invested in Natera prior to the IPO and, through affiliated limited partnerships it controlled, including defendant Sequoia Capital XII, LP, beneficially owned over 20% of the Company's shares as of the IPO. (These two defendants are collectively referred to herein as "Sequoia Capital.") Defendant Botha is a Managing Member of defendant SC XII Management, LLC, the general partner of defendant Sequoia Capital XII, LP and affiliated limited partnerships, and has (and had at the time of the IPO) shared voting and dispositive power over the 7.7 million-plus shares held by those limited partnerships. By virtue of its 20% ownership of Natera and having two directors on Natera's board of directors (defendants Botha and Cozzens) at the time of the IPO, defendant Sequoia Capital effectively controlled Natera and caused it to conduct the IPO. Sequoia Capital has offices in San Mateo County.

20. Defendant Lightspeed Ultimate General Partner VIII, Ltd. is part of a venture capital firm that invested in Natera prior to the IPO and, through affiliated limited partnerships it controlled, including defendant Lightspeed Venture Partners VIII, LP, beneficially owned over 10% of the Company's shares as of the IPO. (These two defendants are collectively referred to herein as "Lightspeed.") Lightspeed's shares included Series A-1 and Series B through Series E Preferred Stock, which all converted into publicly tradable Natera common stock on a one-for-one basis in connection with and immediately prior to the close of the IPO. Defendant Lightspeed Venture Partners VIII, LP held approximately 10% of the Company's shares as of the IPO and defendant Lightspeed Ultimate General Partner VIII, Ltd. had the power to, and did, direct the voting of those Natera shares. By virtue

1    of those holdings, Lightspeed effectively controlled Natera and caused it to market and conduct the

2    IPO.  Lightspeed has offices in San Mateo County.

3          21.      The defendants named in ¶¶19-20 are sometimes collectively referred to herein as the

4    "Venture Capital Defendants."  The Venture Capital Defendants are identified as related parties to

5    Natera in the Registration Statement.  By virtue of their ownership of convertible preferred stock and

6    having directors on Natera's board of directors, the Venture Capital Defendants controlled Natera.

7          22.      Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter to

8    Natera in connection with the IPO.

9          23.      Defendant Cowen and Company, LLC ("Cowen") served as an underwriter to Natera in

10   connection with the IPO.

11         24.      Defendant Piper Jaffray & Co. ("Piper Jaffray") served as an underwriter to Natera in

12   connection with the IPO.

13         25.      Defendant Robert W. Baird & Co. Incorporated ("Baird") served as an underwriter to

14   Natera in connection with the IPO.

15         26.      Defendant Wedbush Securities Inc. ("Wedbush") served as an underwriter to Natera in

16   connection with the IPO.

17         27.      Defendants Morgan Stanley, Cowen, Piper Jaffray, Baird and Wedbush (the

18   "Underwriter Defendants)" are each financial services firms that acted as the lead and representative

19   underwriters of Natera's IPO from their California-based offices, by helping to draft, approve the

20   content of, and disseminate, the offering documents, by marketing the IPO, and by selling Natera's

21   stock directly to investors per the underwriting syndicate allocation of 4,000,000, 2,150,000, 2,150,000,

22   900,000, and 800,000 shares, respectively, not including the additional shares sold pursuant to the

23   underwriting syndicate's "greenshoe" option.  Morgan Stanley's offices are located in San Mateo

24   County, and the remaining Underwriter Defendants have offices in San Francisco.  Pursuant to the

25   Securities Act, the Underwriter Defendants (and Natera where applicable) are liable for the false and

26   misleading statements in the Registration Statement as follows:

27         (a)      Pursuant to the Securities Act, the Underwriter Defendants are liable for the false

28   and misleading statements in the Offering's Registration Statement and Prospectus.  The Underwriter

- 8 -

1  Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to

2  the harm complained of herein.

3          (b)    The Underwriter Defendants are primarily investment banking houses which

4  specialize, *inter alia*, in underwriting public offerings of securities.  They served as the underwriters of

5  the IPO and received approximately $13.7 million in fees, including underwriting discounts and

6  commissions from the Offering and greenshoe.  The Underwriter Defendants determined that in return

7  for their share of the IPO proceeds, they were willing to merchandize Natera common stock in the IPO.

8  The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they and

9  representatives from Natera directly invited investors to meetings and webcasts for the purpose of

10  encouraging investment in the IPO and pitched investors who purchased shares in the IPO.  As the

11  underwriters of the Offering, in addition to their lucrative underwriting fees, they also received an

12  option to purchase 1.5 million additional shares of common stock at the public offering price, less

13  underwriting discounts and commissions; they exercised the option to purchase 900,000 additional

14  shares.

15          (c)    The Underwriter Defendants decided that in return for substantial fees and an

16  option to purchase 1.5 million shares, they were willing to underwrite and market Natera's common

17  stock in the Offering.  The Underwriter Defendants met with potential investors and presented highly

18  favorable but materially incorrect and/or materially misleading information about the Company, its

19  business, products, plans, and financial prospects, and/or omitted to disclose material information

20  required to be disclosed under the federal securities laws and applicable regulations promulgated

21  thereunder.

22          (d)    Representatives of the Underwriter Defendants also assisted Natera and the

23  Individual Defendants in planning the Offering.  They also purported to conduct an adequate and

24  reasonable investigation into the business, operations, products and plans of Natera, an undertaking

25  known as a "due diligence" investigation.  During the course of their "due diligence," the Underwriter

26  Defendants had continual access to confidential corporate information concerning Natera's business,

27  financial condition, products, plans and prospects.

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    (e)    In addition to having access to internal Natera corporate documents, the

2 Underwriter Defendants and/or their agents, including their counsel, had access to Natera's lawyers,

3 management, directors and top executives to determine: (i) the strategy to best accomplish the Offering;

4 (ii) the terms of the Offering, including the price at which Natera common stock would be sold; (iii) the

5 language to be used in the Registration Statement; (iv) what disclosures about Natera would be made in

6 the Registration Statement; and (v) what responses would be made to the SEC in connection with its

7 review of the Registration Statement.  As a result of those constant contacts and communications

8 between the Underwriter Defendants' representatives and Natera's management and top executives, at a

9 minimum the Underwriter Defendants should have known of Natera's undisclosed existing problems

10 and plans, and the material misstatements and omissions contained in the Registration Statement as

11 detailed herein.

12    (f)    The Underwriter Defendants caused the Registration Statement to be filed with

13 the SEC and to be declared effective in connection with offers and sales of Natera shares pursuant

14 and/or traceable to the Offering and relevant offering materials, including to plaintiff and the Class.

15    28.    The true names and capacities of defendants sued herein under California Code of Civil

16 Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who therefore

17 sues these defendants by such fictitious names.  Plaintiff will seek to amend this complaint and include

18 these Doe defendants' true names and capacities when they are ascertained.  Each of the fictitiously

19 named defendants is responsible in some manner for the conduct alleged herein and for the injuries

20 suffered by the Class.

21                              **FACTUAL BACKGROUND**

22 **Natera and Its Business**

23    29.    The Company's stated goal is to develop and commercialize minimally or non-invasive

24 tests for the highly reliable detection of DNA variations covering a broad set of diseases.[2]  The

25 

26 [2]    Natera's approach, called massively multiplexed polymerase chain reaction ("mmPCR"), combines
proprietary molecular biology and computational techniques to measure genomic variations in tiny
27 amounts of DNA. The Company has developed computationally intensive algorithms that combine the
data generated by mmPCR with the ever-expanding set of publicly available data on genetic variations.
28 The Company has optimized these algorithms to enable laboratories to run diagnostic tests locally and
access Natera's algorithms in the cloud. Natera's tests detect copy number variations ("CNVs") and

1  Company generates revenue primarily from the sale of Panorama, its non-invasive prenatal test, or

2  NIPT, which was launched in March 2013.[3] The Company claims that Panorama is the "most accurate

3  NIPT commercially available in the United States," and that its "specificity and sensitivity reduce the

4  need for unnecessary confirmatory invasive procedures, lowering the total cost to the healthcare system

5  of these procedures and limiting the resulting risk of spontaneous miscarriage." Panorama non-

6  invasively screens for fetal chromosomal abnormalities, including Down syndrome, Edwards syndrome,

7  Patau syndrome, Turner syndrome and triploidy. Panorama can be performed as early as nine weeks

8  into a pregnancy, which is significantly earlier than traditional methods.

9       30.    In 2014, the Company enhanced Panorama by adding the capability to screen for five of

10  the most common genetic diseases caused by microdeletions, which, according to data published in

11  *Prenatal Diagnosis* and *American Journal of Obstetrics & Gynecology*, are more common than Down

12  syndrome for women younger than approximately 32 years of age.[4] Unlike Down syndrome and other

13  chromosomal abnormalities, where risk increases with maternal age, the risk of these five

14  microdeletions is independent of maternal age. Stated differently, tests for fetal chromosomal

15  abnormalities tend to be performed primarily in high-risk pregnancies, while tests for microdeletions

16  can be performed in both high-risk pregnancies *and* average-risk pregnancies. Natera estimated that in

17  2013 there were approximately four million births in the United States, of which approximately 600,000

18  (or 15%) were considered high risk. By expanding Panorama's use in pregnancies classified as average

19  risk, Natera supposedly would be able to greatly expand revenue.

20       31.    In fact, Natera's growth depended in large part on expanding Panorama's use in average-

21  risk pregnancies because the high-risk pregnancy market was essentially fully penetrated:

22

23  single nucleotide variants ("SNVs"). A CNV is a genetic mutation in which relatively large regions of
   the genome have been deleted or duplicated. An SNV is a mutation where a single base has changed.

24  When single-base changes are common in the population, that position on the chromosome is called a
   single nucleotide polymorphism ("SNP").

25

26  [3]   Panorama revenues accounted for 56% and 73% of Natera's revenue in 2013 and 2014,
   respectively.

27  [4]   Microdeletions are missing sub-chromosomal pieces of DNA, which can have serious health
28  implications depending on the location of the deletion.

| Company | US Average Risk Tests | | | | |
|---|---|---|---|---|---|
| | 2012E | 2013E | 2014E | 2015E | 2016E |
| Sequenom | 200 | 1,490 | 4,860 | 6,230 | 7,040 |
| Ariosa | 797 | 5,374 | 6,000 | 6,400 | 6,750 |
| Illumina | 320 | 600 | 3,450 | 7,200 | 9,000 |
| LabCorp | | | 2,000 | 6,000 | 13,000 |
| Natera | 0 | 12,050 | 81,000 | 127,300 | 159,100 |
| TOTAL | 1,317 | 19,514 | 97,310 | 153,130 | 194,890 |
| % Low Risk Penetration | 0.1% | 0.9% | 4.4% | 7.0% | 8.9% |

*Assumes 2.2MM Average Risk Tests in US is max. Based on industry checks and company projections.

32.     By contrast, the average-risk pregnancy market had barely been tapped:

| Company | US High Risk Tests | | | | |
|---|---|---|---|---|---|
| | 2012E | 2013E | 2014E | 2015E | 2016E |
| Sequenom | 62,729 | 149,000 | 162,000 | 174,440 | 172,480 |
| Ariosa | 26,550 | 102,101 | 95,000 | 25,000 | 35,000 |
| Illumina | 16,000 | 30,000 | 110,000 | 150,000 | 150,000 |
| LabCorp | | | 30,000 | 114,000 | 117,000 |
| Natera | 0 | 36,150 | 59,000 | 64,200 | 69,200 |
| TOTAL | 105,279 | 317,251 | 456,000 | 527,640 | 543,680 |
| % High Risk Penetration* | 19% | 57% | 81% | 94% | 97% |

*Assumes 560k High Risk Tests in US is max. Assumes theoretical max of 750k adjusted by 25% for low pre-natal care compliance

33.     Natera uses the number of tests accessioned as a key indicator to assess its business.[5] Over 65,000 and 185,000 Panorama tests were accessioned during the years ended December 31, 2013 and 2014, respectively, and over 55,000 Panorama tests were accessioned during 1Q15.

34.     The Company acknowledged that its "ability to increase [its] revenues will depend on [its] ability to further penetrate the domestic and international markets and, in particular generate sales through [its] direct sales force, offer additional tests, obtain reimbursement from additional third-party payers and increase [its] reimbursement rate for tests performed."

---

[5]   A test is accessioned when Natera receives the test, the relevant information about the test is entered into its computer system and the test sample is routed into the appropriate sample flow.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

35.     Natera's customers include independent laboratories, national and regional reference laboratories, medical centers and physician practices.. The Company markets and sells its tests both through its sales force and its laboratory distributors.  Natera bills clinics, laboratory distribution partners, patients and insurance payers for the tests the Company performs.  In cases where Natera bills laboratory distribution partners, its partners in turn bill clinics, patients and insurance payers.  Insurers reimburse for NIPT procedures in high-risk pregnancies based on positive coverage decisions, which means that the insurer has determined that NIPT in general is medically necessary for this category of patient.

36.     The Company attributed its commercial success and future growth prospects in part to its independent direct sales force, which, at the time of the IPO, Natera stated it was continuing to expand.  Indeed, Natera stated that "[w]e can offer all of our products through our direct sales force and at a higher gross margin percentage than when we service customers through a partner."  Natera also stated that the "percentage of our overall accessioned tests generated through the higher margin U.S. direct sales force increased from approximately 25% in 2013 to approximately 44% in 2014, and to approximately 60% for the three months ended March 31, 2015."

**Natera's Ownership and Compensation Plan**

37.     Before going public, Natera's directors and stockholders approved a 1-for-1.63 reverse split of its capital stock on June 19, 2015.  Just before the Offering, the Company had approximately 38.4 million shares of common stock outstanding.  As of July 31, 2015, there were 49.9 million shares of stock outstanding, 76.9% of which was owned by existing stockholders before the IPO, and 23.1% of which was owned by new investors.

38.     Before the IPO, none of the directors were compensated for service as a member of Natera's board of directors.  At the completion of the IPO, the directors were each eligible to receive compensation for their service on the board of directors as follows:

| Position | Retainer |
| --- | --- |
| Board Member | $35,000 |
| Lead Independent Director | $15,000 |
| Audit Committee Chair | $15,000 |
| Compensation Committee Chair | $12,000 |
| Nominating and Corporate Governance Committee Chair | $10,000 |

| Audit Committee Member | $7,500 |
| Compensation Committee Member | $6,000 |
| Nominating and Corporate Governance Committee Member | $5,000 |

39.     In addition to the retainer above, each director is eligible to receive an annual stock option grant of 11,169 shares to be granted at Natera's annual meeting of stockholders beginning in 2016.

## MATERIALLY FALSE AND MISLEADING REGISTRATION STATEMENT

40.     On July 2, 2015, Natera conducted its IPO, selling 10.9 million shares at $18 per share and raising approximately $178.5 million in proceeds, including the underwriters' exercise of the overallotment option.

41.     In the Registration Statement, the Company reported the following with respect to its financial condition:

|  | FY2013 | FY2014 | % Change | 1Q14 | 1Q15 | % Change |
|---|---|---|---|---|---|---|
| Revenues | $55.1 million | $159.2 million | 188.7% | $27.2 million | $47.4 million | 73.8% |
| Net Loss | ($37.1 million) | ($5.1 million) | (86.1%) | ($9.6 million) | ($10 million) | 4% |

42.     Indeed, Natera portrayed itself as a "rapidly growing diagnostics company" with huge year-over-year increases in revenues – purportedly of nearly 200%. The Company represented that its revenues were in a "quarterly" growth "trend" and that its "rapid growth of revenues is attributed to reimbursement from increased volumes of . . . Panorama" – the Company's primary product. The Registration Statement created the impression that gross margins were high and increasing, making such statements as "Panorama's test performance has allowed us to command a price premium" while achieving a high volume of accessions, "increase[s in] the number of tests distributed . . . in the third and fourth quarters of 2014 resulted in a higher average payment per test," "average costs per unit decreased" in 2014, and direct sales force sales were "at a higher gross margin percentage" and had increased significantly. The Registration Statement characterized the decrease in revenue and increase in net loss in 1Q15 as not "a reliable indicator of our future results," also suggesting it was merely due to "new CPT codes" that came into effect at the beginning of the quarter and an associated "delay in

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1   revenue recognition," adding that "not all payers may implement this code in a timely fashion." But the

2   statements and the reported financial results above were false and misleading and omitted material

3   information because sales of the Company's flagship product had flat-lined, Natera was contracting at

4   lower prices that were significantly shrinking revenues and gross margin, and then-current (second

5   quarter) results were far, far worse.

6       43.    In fact, revenues were soft and there was a huge net loss,

|  | 2014 | 2015 | % Change |
|---|---|---|---|
| Revenues | $35.8 million | $45 million | 25.8% |
| Net Loss | ($514,000) | ($19.6 million) | 3,729% |

9       44.    Natera's nearly $20 million net loss in 2Q15 exceeded any other quarterly loss the

10  Company had suffered by between almost 100% and 3700% since at least 2Q13 when Panorama was

11  released:

|  | 2Q13 | 3Q13 | 4Q13 | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 |
|---|---|---|---|---|---|---|---|---|---|
| Net Loss | ($8.9m) | ($5.5m) | ($4.7m) | ($9.6m) | ($514k) | ($3.7m) | ($1.2m) | ($10m) | ($19.6m) |

14      45.    Natera's 2Q15 revenue decline was also the second quarter in a row of declining

15  revenue:



23      46.    With respect to Panorama, Natera's flagship NIPT product and key revenue driver, the

24  Registration Statement portrayed it as being in a significant growth "trend," stated that large increases

25  in revenues were "primarily due to increased sales of Panorama," and represented that quarterly and

26  annual year-over-year increases in Panorama tests accessioned were increasing revenue greatly.

|  | 2013 | 2014 | 1Q14 | 1Q15 |
|---|---|---|---|---|
| Panorama Tests Accessioned | 65,000+ | 185,000+ | 38,000+ | 55,000+ |

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

47.     The statements above were false and misleading and omitted material information.  In fact, Panorama tests accessioned in which revenue was recognized had already flat-lined at 28,000+ tests, and the percent of Panorama tests accessioned in which revenue was recognized in the same quarter had dramatically declined to a mere 47%, as third-party payers were refusing to reimburse patients for Panorama adequtely and doctors were not recommending it:

|  | 2013 | 2014 | 1Q14 | 1Q15 | 2Q14 | 2Q15 |
|---|---|---|---|---|---|---|
| Panorama Tests Accessioned | 65,000+ | 185,000+ | 38,000+ | 55,000+ | 47,000+ | 58,000+ |
| Panorama Tests Accessioned and Revenue Recognized | 45,000+ | 121,000+ | 28,000+ | 28,000+ | 35,000+ | 28,000+ |
| % Accessioned in Same Quarter in Which Revenue Recognized | 100% | 94% | 78% | 57% | 74% | 47% |

48.     The Registration Statement referred to pages and pages of generalized "risks and uncertainties" that purportedly were then not occurring but if they "actually occur[red]," "could . . . materially and adversely affect[]" Natera.  But many of these statements were materially false and misleading and omitted material then-current factual information.  "Our quarterly results may fluctuate significantly, which could adversely impact the value of our stock," "*if* our efforts to further increase the use and adoption of Panorama . . . do not succeed, our business will be harmed," and the "NIPT market *may* not grow as we expect, and NIPTs *may* not gain acceptance for use in the average-risk pregnancy population, which *would* limit the market for Panorama," the Registration Statement impotently stated.  Those statements were false and misleading and omitted material information because Natera was sitting on then-current bleak results from operations and constrained guidance resulting therefrom that would certainly adversely impact Natera's stock value, and indeed that was due in part to the flat-lining of Panorama test accessions, price concessions, and factors limiting the market for Panorama, including third-party payer refusals and doctor behavior.

49.     The Registration Statement asserted as a mere "uncertaint[y]" that "third-party payers, such as commercial insurance companies and government insurance programs, *may* decide not to reimburse for Panorama, *may* not reimburse for uses of Panorama for the average-risk pregnancy population or for the screening of microdeletions, or *may* set the amounts of such reimbursements at

1   prices that do not allow us to cover our expenses." It also stated that "*[i]f* we are unable to expand

2   third-party payer coverage and reimbursement for Panorama and our other tests, *if* third-party payers

3   withdraw coverage or provide lower levels of reimbursement due to changing policies, billing

4   complexities or other factors, or *if* we are required to refund any reimbursements already received, our

5   revenues and results of operations would be adversely affected." But these statements were false and

6   misleading and omitted material information because the purportedly merely "possible" future had

7   already arrived. Third-party payers were reducing reimbursement amounts and prices, even those third-

8   party payers that were contracting when coverage was previously out-of-network were doing so at

9   significantly reduced prices, and Natera could not offset this with expanded coverage and

10  reimbursement, and the results were damning to the Company as reflected in the then-current (but not

11  revealed) 2Q15 results

12       50.     Similarly, the Registration Statement stated insurance coverage was "expanding," but

13  "*[i]f* we are unable to obtain or maintain adequate reimbursement coverage from third-party payers" or

14  "*if* reimbursement coverage is unavailable or reimbursement amounts are inadequate," "physicians *may*

15  be reluctant to order the use of our tests" in the future and "results from operations and prospects could

16  be materially and adversely affected." Likewise, it stated: "*If* adequate third-party reimbursement is

17  unavailable, we *may* not be able to maintain price levels," "*[i]f* we are successful in entering into

18  additional contractual arrangements with commercial third-party payers . . . the amount of overall

19  reimbursement we receive may decrease *if*, as we would expect, we are reimbursed less money per test

20  at a contracted rate than at a non-contracted rate, which *could* have a negative impact on our revenue,"

21  "*if* we do have written agreements regarding reimbursement . . . those agreements are not guarantees of

22  reimbursement coverage in an adequate amount," and "third-party payers *may* review and adjust the

23  rate of reimbursement." In addition, the Registration Statement stated "not all payers *may* implement"

24  a new CPT code "in a timely fashion, and reimbursement *may* be less than we have received in the

25  past." All of the statements above were false and misleading and omitted material information. In

26  truth, these events were already occurring and already having a significant negative effect on the

27  Company's revenues, margins and prospects. Indeed, Natera's prices were then going down as a result

28  of contracts with third-party payers and third-party payer reimbursement coverages, amounts and

1   negotiated price levels.  There were payers that *were* in fact implementing the new CPT code in such a

2   way that reimbursement *was* in fact less than what Natera had been historically receiving.

3       51.    The information misrepresented and omitted by defendants in the Registration Statement

4   was material.  Even securities analysts employed by the Underwriter Defendants professed surprise at

5   the decline in gross margins for the quarter that ended over one week before the IPO closed.  When

6   Natera began to reveal these facts just weeks after the IPO, analysts made comments such as:

7   "***Surprisingly [gross margins] were flattish despite significantly more NIPTs and sequentially down***

8   ***sales.***"  Another analyst referred to it as "***a pretty big step down*** in the second half in terms of gross

9   margin."  And when securities analysts pressured the Company's executives in Natera's first earnings

10  call, suggesting other companies had been more forthcoming about reimbursement levels, Natera's

11  executives got defensive, finally admitting Natera had "been ***under pressure since the coding change***

12  ***[b]eginning in January of 2015, it hurt.***"  Even so, Natera executives continued to try and down play

13  the significance of their gross margin declines, emphasizing volume increases and efforts to decrease

14  cost of goods sold.  But the Company later admitted margin declines were more significant than they

15  had previously suggested, with analysts describing the declines, for example, as "***a big step down in the***

16  ***fourth quarter.***"  Likewise, as it was revealed that the Company was lowering its top-end revenue

17  guidance, that future growth was not as telegraphed in the IPO, and that revenues and margins were

18  being affected by third-party payer contract reimbursement levels and pricing declines, investors

19  reacted negatively.

20      52.    Natera's Registration Statement, including the Prospectus incorporated therein, presented

21  a highly positive picture of the Company's business, performance, prospects and products, while

22  omitting these known trends and facts that had already had a materially unfavorable impact on Natera's

23  revenues and net losses at the time of the IPO.  *See* Item 303 of SEC Reg. S-K, 17 C.F.R.

24  §229.303(a)(3)(ii) (requiring that the materials incorporated in a registration statement disclose all

25  "known trends or uncertainties" reasonably expected to have a material, unfavorable impact on a

26  company's operations).  As a result of the foregoing herein and alleged above, the Company would not

27  be able to meet previously stated guidance regarding results from operations.

28

53.     The IPO was a success for the Company and the Underwriter Defendants, who sold 10.9 million shares of Natera common stock to the public at $18 per share (including 900,000 shares of common stock sold pursuant to the Underwriter Defendants' exercise of the over-allotment option) raising $178.5 million in gross proceeds for the Company.

54.     At the time of the filing of this action, Natera stock was trading in the range of $6.50-$7.00 per share, or less than **half of the IPO price**, having plummeted in response to information reflecting the materialization of significant risks misrepresented and omitted from the Registration Statement as alleged herein, and to the partial revelation of material facts previously omitted and misrepresented as alleged herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action on behalf of a class consisting of all purchasers of Natera common stock in and/or traceable to the Company's IPO and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable. According to the Company's most recent Form 10-Q, there were more than 49.9 million shares of Natera common stock outstanding as of October 30, 2015. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members of the proposed Class. The members of the proposed Class may be identified from records maintained by Natera or its transfer agent and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

57.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

- 19 -

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether the Registration Statement and Prospectus contained materially false and misleading statements and omissions; and

(c)     to what extent plaintiff and members of the Class have sustained damages and the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### Violations of §11 of the Securities Act
### Against All Defendants Except the Venture Capital Defendants

61.     Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

62.     This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except the Venture Capital Defendants.  This is a non-fraud cause of action.  Plaintiff does not assert that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

63.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

64.     The defendants named in this Cause of Action are strictly liable to plaintiff and the Class for the misstatements and omissions.

65.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

66.    By reason of the conduct alleged herein, each of these defendants violated, and/or controlled a person who violated, §11 of the Securities Act.

67.    Plaintiff acquired Natera common stock in the IPO.

68.    Plaintiff and the Class have sustained damages. The value of Natera common stock has declined substantially subsequent to and due to these defendants' violations.

69.    At the time of their purchases of Natera common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### Violations of §12(a)(2) of the Securities Act
### Against All Defendants Except the Venture Capital Defendants

70.    Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

71.    This Cause of Action is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), against all defendants except the Venture Capital Defendants. This is a non-fraud cause of action. Plaintiff does not assert that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent. The defendants named in this Cause of Action sold Natera stock or were directly involved in the sale of Natera stock by approving statements made in the Prospectus and roadshow that encouraged investment in the IPO, and in so doing were motivated by a desire to serve their own financial interests or the financial interests of the pre-IPO owners of Natera stock.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

72.     By means of the defective Prospectus and other conduct alleged herein, Natera, the Individual Defendants and the Underwriter Defendants promoted and sold Natera common stock to plaintiff and other members of the Class. The defendants named in this Cause of Action were sellers, offerors and/or solicitors of purchasers of the Natera stock offered pursuant to the Offering. Defendants issued, caused to be issued and/or signed the Registration Statement issued in connection with the Offering. The Prospectus was used to induce investors, such as plaintiff and the other members of the Class, to purchase Natera shares.

73.     The Prospectus and roadshow communications contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above. The defendants named in this Cause of Action owed plaintiff and the other members of the Class who purchased Natera common stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

74.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time plaintiff acquired Natera common stock.

75.     By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violation, plaintiff and the other members of the Class who purchased Natera common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock. Accordingly, plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRD CAUSE OF ACTION**

**For Violation of §15 of the Securities Act**
**Against All Defendants Except the Underwriter Defendants**

76.     Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

77.     This Cause of Action is brought pursuant to §15 of the Securities Act against all defendants except the Underwriter Defendants.

78.     The Individual Defendants were each control persons of Natera by virtue of their positions as directors and/or senior officers of Natera.  By virtue of pre-IPO shareholder agreements, their stock holdings, and having designees on the Natera board of directors at the time of the IPO, the Venture Capital Defendants had the power to (and did) control Natera.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Natera.  Sequoia Capital controlled its designees on Natera's board, Botha and Cozzens, who are defendants named herein.  Those designees, Botha and Cozzens, and Healy, were controlled by Sequoia Capital and Lightspeed, respectively.  The Company controlled the Individual Defendants and all of Natera's employees.

79.     The Venture Capital Defendants had a financial interest in taking the Company's stock public to increase the holding value and marketability of their entities and their investments in Natera. Natera, the Venture Capital Defendants and the Individual Defendants each were critical to effecting the IPO, based on their signing or authorization of the signing of the Registration Statement, by voting (including voting their shares) to execute the IPO, and having otherwise directed through their authority the processes leading to execution of the IPO.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action, certifying plaintiff as a Class representative under California Rule of Court 3.764 and California Code of Civil Procedure §382, and plaintiff's counsel as Class counsel;

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1       B.      Awarding compensatory damages in favor of plaintiff and the Class against all

2 defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an

3 amount to be proven at trial, including interest thereon;

4       C.      Awarding plaintiff and the Class rescission or a rescissory measure of damages on their

5 §12(a)(2) claims;

6       D.      Awarding plaintiff and the Class pre-judgment and post-judgment interest, as well as

7 reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

8       E.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

9 **JURY DEMAND**

10      Plaintiff hereby demands a trial by jury.

11 DATED: February 17, 2016              ROBBINS GELLER RUDMAN
                                    & DOWD LLP

12                              JAMES I. JACONETTE
                             DANIELLE S. MYERS

13

14

15                                   JAMES I. JACONETTE

16                            655 West Broadway, Suite 1900
                           San Diego, CA  92101-8498

17                            Telephone: 619/231-1058
                           619/231-7423 (fax)

18

19                            ROBBINS GELLER RUDMAN
                                    & DOWD LLP

20                            SHAWN A. WILLIAMS
                           Post Montgomery Center

21                            One Montgomery Street, Suite 1800
                           San Francisco, CA  94104

22                            Telephone: 415/288-4545
                           415/288-4534 (fax)

23                            ROBBINS GELLER RUDMAN
                                    DOWD LLP

24                            SAMUEL H. RUDMAN
                           58 South Service Road, Suite 200

25                            Melville, NY  11747
                           Telephone: 631/367-7100

26                            631/367-1173 (fax)

27

28

- 24 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

NATERA, INC., MATTHEW RABINOWITZ, JONATHAN SHEENA,
ROELOF F. BOTHA (Additional Parties Attachment form is attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM,
Individually and on Behalf of All Others Similarly Situated



FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**FILED**
**SAN MATEO COUNTY**

FEB 1 7 2016

Clerk of the Superior Court
By
DEPUTY CLERK

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* San Mateo County Superior Court | CASE NUMBER<br>*(Número del Caso):* **CIV537409** |
|---|---|

400 County Center
Redwood City, CA 94063

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

James I. Jaconette, Robbins Geller, et al., 655 W. Broadway, Ste. 1900, San Diego CA 92101 619/231-1058

| DATE: **FEB 1 7 2016**<br>*(Fecha)* | Clerk, by **RODINA M. CATALANO** | , Deputy |
|---|---|---|
| | *(Secretario)* | *(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
[SEAL]
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
      ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
      ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
      ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| — City of Warren Police and Fire Ret. Sys v. Natera, Inc., et al. | |

## INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff    ☑ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

TODD COZZENS,
EDWARD C. DRISCOLL, JR.,
JAMES I. HEALY,
JOHN STEUART,
SEQUOIA CAPITAL XII, LP,
SC XII MANAGEMENT, LLC,
LIGHTSPEED VENTURE PARTNERS VIII,
   LP,
LIGHTSPEED ULTIMATE GENERAL
   PARTNER VIII, LTD.,
MORGAN STANLEY & CO. LLC,
COWEN AND COMPANY, LLC,
PIPER JAFFRAY & CO.,
ROBERT W. BAIRD & CO. INCORPORATED,
WEDBUSH SECURITIES INC. and
DOES 1-25, inclusive,
Defendants

Page   1   of   1

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|

— James I. Jaconette (179565)
ROBBINS GELLER RUDMAN & DOWD LLP
655 W. Broadway, Suite 1900
San Diego, CA 92101
TELEPHONE NO.: 619/231-1058      FAX NO.: 619/231-7423
ATTORNEY FOR *(Name)*: Plaintiff City of Warren Police and Fire Ret. Sys.

**FILED**
**SAN MATEO COUNTY**

**FEB 1 7 2016**

Clerk of the Superior Court
by
DEPUTY CLERK

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Hall of Justice and Records

CASE NAME:
City of Warren Police and Fire Ret. Sys. v. Natera, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | C I V 5 3 7 4 0 9 |
| | | | JUDGE: | |
| | | | DEPT: | File By Fax |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[✓] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [✓] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [✓] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [✓] monetary   b. [✓] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action *(specify)*: Three
5. This case [✓] is   [ ] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: February 17, 2016

James I. Jaconette
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courtinfo.ca.gov |
|---|---|---|

| Attorney or Party without Attorney (Name/Address)<br>James I. Jaconette, Robbins Geller Rudman & Dowd<br><br>655 W. Broadway, Ste. 1900, San Diego CA 92101<br><br>Telephone: 619/231-1058<br>State Bar No.: 179565<br>Attorney for: Plaintiff City of Warren Police and Fire Ret Svs<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SAN MATEO<br>400 COUNTY CENTER<br>REDWOOD CITY, CA  94063 | FOR COURT USE ONLY<br><br>**FILED**<br>**SAN MATEO COUNTY**<br><br>FEB 1 7 2016<br><br>Clerk of the Superior Court<br>By _____<br>DEPUTY CLERK |
|---|---|
| **Plaintiff**<br>City of Warren Police and Fire Retirement System | |
| **Defendant**<br>Natera, Inc., et al. | |
| **Certificate Re Complex Case Designation** | CIV 538740 0 |

File By Fax

# This certificate must be completed and filed with your Civil Case Cover Sheet if you have checked a Complex Case designation or Counter-Designation

1.      In the attached Civil Case Cover Sheet, this case is being designated or counter-designated as a complex case [or as not a complex case] because at least one or more of the following boxes has been checked:

  ☑ Box 1 – Case type that is best described as being [or not being] provisionally complex civil litigation (i.e., antitrust or trade regulation claims, construction defect claims involving many parties or structures, securities claims or investment losses involving many parties, environmental or toxic tort claims involving many parties, claims involving mass torts, or insurance coverage claims arising out of any of the foregoing claims).

  ☑ Box 2 – Complex [or not complex] due to factors requiring exceptional judicial management

  ☑ Box 5 – Is [or is not] a class action suit.

2.      This case is being so designated based upon the following supporting information [including, without limitation, a brief description of the following factors as they pertain to this particular case: (1) management of a large number of separately represented parties; (2) complexity of anticipated factual and/or legal issues; (3) numerous pretrial motions that will be time-consuming to resolve; (4) management of a large number of witnesses or a substantial amount of documentary evidence; (5) coordination with related actions

pending in one or more courts in other counties, states or countries or in a federal court;
(6) whether or not certification of a putative class action will in fact be pursued; and (7)
substantial post-judgment judicial supervision]:

This case is provisionally complex as it involves securities claims.   In

addition, it is being designated complex due to the large number of

parties, the complexity of factual and/or legal issues and because

certification of a putative class will be pursued.

*(attach additional pages if necessary)*

3.    Based on the above-stated supporting information, there is a reasonable basis for the complex
case designation or counter-designation [~~or no complex case counter-designation~~] being made
in the attached Civil Case Cover Sheet.

*****

I, the undersigned counsel or self-represented party, hereby certify that the above is true and correct
and that I make this certification subject to the applicable provisions of California Code of Civil
Procedure, Section 128.7 and/or California Rules of Professional Conduct, Rule 5-200 (B) and San
Mateo County Superior Court Local Rules, Local Rule 2.30.

Dated:  February 17, 2016

James I. Jaconette
[Type or Print Name]                    [Signature of Party or Attorney For Party]

| Attorney or Party without Attorney: | | For Court Use Only |
|---|---|---|
| James I. Jaconette, Esq., Bar #179565<br>Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone No: 619-231-1058     FAX No: 619-231-7423 | | **F I L E D**<br>SAN MATEO COUNTY<br><br>MAR - 1 2016<br><br>Clerk of the Superior Court<br>By _____<br>DEPUTY CLERK |
| | Ref. No. or File No.: | |
| Attorney for: Plaintiff | | |
| Insert name of Court, and Judicial District and Branch Court: | | |
| San Mateo County Superior Court | | |
| Plaintiff: City of Warren Police & Fire Retirement System | | |
| Defendant: Natera, Inc., et al. | | |

| Proof Of Service<br>Summons; Complaint | Hearing Date: | Time: | Dept/Div: | Case Number:<br>CIV537409 |
|---|---|---|---|---|

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of the Summons; Class Action Complaint; Civil Case Cover Sheet; Certificate re Complex Case Designation; Notice of Case Management Conference; ADR Information Sheet; ADR Stipulation and Evaluation Instructions; San Mateo Superior Local Complex Rules; Notice re Nonrefundable Advance Jury Fees

3. a. Party served:                                    Robert W. Baird & Co. Incorporated
   b. Person served:                                   Becky De George, Person Authorized to Accept Service, Caucasian, Female, 48-53 Yrs Old, Blonde Hair, 170 Lbs.

4. Address where the party was served:                 Corporation Service Company
                                                       2710 Gateway Oaks Drive
                                                       Suite 150N
                                                       Sacramento, CA 95833

5. I served the party:
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Wed., Feb. 17, 2016 (2) at: 2:45PM

6. The "Notice to the Person Served" (on the Summons) was completed as follows:
   on behalf of: Robert W. Baird & Co. Incorporated
   Under CCP 416.10 (corporation)

7. *Person Who Served Papers:*                          Recoverable Cost Per CCP 1033.5(a)(4)(B)
   a. Robert J. Mason                                   d. *The Fee for Service was:*
   b. **Class Action Research & Litigation**            e. I am: (3) registered California process server
      P O Box 740                                          *(i)* Independent Contractor
      Penryn, CA 95663                                     *(ii) Registration No.:*      03-007
   c. (916) 663-2562, FAX (916) 663-4955                    *(iii) County:*              Placer

8. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   Date: Mon, Feb. 22, 2016

Proof Of Service<br>Summons; Complaint                     (Robert J. Mason)                jajac.154873

| *Attorney or Party without Attorney:*<br>James I. Jaconette, Esq., Bar #179565<br>Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA  92101<br>*Telephone No:* 619-231-1058        *FAX No:* 619-231-7423 | *For Court Use Only*<br><br>**FILED**<br>**SAN MATEO COUNTY**<br><br>MAR 1 2016<br><br>Clerk of the Superior Court<br>By<br>DEPUTY CLERK |
|---|---|
| *Ref. No. or File No.:* | |

*Attorney for:* Plaintiff

*Insert name of Court, and Judicial District and Branch Court:*
San Mateo County Superior Court

*Plaintiff:* City of Warren Police & Fire Retirement System
*Defendant:* Natera, Inc., et al.

| **Proof Of Service**<br>**Summons; Complaint** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>CIV537408 |
|---|---|---|---|---|

*1.  At the time of service I was at least 18 years of age and not a party to this action.*

2.  I served copies of the Summons; Class Action Complaint; Civil Case Cover Sheet; Certificate re Complex Case Designation; Notice of Case Management Conference; ADR Information Sheet; ADR Stipulation and Evaluation Instructions; San Mateo Superior Local Complex Rules; Notice re Nonrefundable Advance Jury Fees

*3.  a. Party served:*        Cowen and Company, LLC
    *b. Person served:*      Janelle M. Villar

*4.  Address where the party was served:*        National Corporate Research
                                                 600 Wilshire Blvd., #980
                                                 Los Angeles, CA  90017

*5.  I served the party:*
    **a. by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Thu., Feb. 18, 2016 (2) at: 2:18PM

*6.  The "Notice to the Person Served" (on the Summons) was completed as follows:*
    *on behalf of:*  Cowen and Company, LLC
    *Other:*  limited liability company

*7.  Person Who Served Papers:*                                          Recoverable Cost Per CCP 1033.5(a)(4)(B)
    a. Dani Greene                                          d.  *The Fee for Service was:*
    b. Class Action Research & Litigation                   e.  I am: (3) registered California process server
       P O Box 740                                              *(i)*   Independent Contractor
       Penryn, CA  95663                                        *(ii)*  *Registration No.:*        140/6700
    c. (916) 663-2562, FAX (916) 663-4955                       *(iii)* *County:*                  Los Angeles

*8.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

    *Date: Thu, Feb. 18, 2016*

                                                                    *Dani Greene*

| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | Proof Of Service<br>Summons; Complaint | *jajac.154871* |
|---|---|---|

| Attorney or Party without Attorney: James I. Jaconette, Esq., Bar #179565 Robbins Geller Rudman & Dowd LLP 655 West Broadway, Suite 1900 San Diego, CA 92101 Telephone No: 619-231-1058    FAX No: 619-231-7423 | | For Court Use Only F I L E D SAN MATEO COUNTY MAR - 1 2016 Clerk of the Superior Court DEPUTY CLERK |
|---|---|---|
| Attorney for: Plaintiff | Ref. No. or File No.: | |
| Insert name of Court, and Judicial District and Branch Court: San Mateo County Superior Court | | |
| Plaintiff: City of Warren Police & Fire Retirement System | | |
| Defendant: Natera, Inc., et al. | | |

| Proof Of Service Summons; Complaint | Hearing Date: | Time: | Dept/Div: | Case Number: CIV537408 |
|---|---|---|---|---|

*FILE BY FAX*

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Summons; Class Action Complaint; Civil Case Cover Sheet; Certificate re Complex Case Designation; Notice of Case Management Conference; ADR Information Sheet; ADR Stipulation and Evaluation Instructions; San Mateo Superior Local Complex Rules; Notice re Nonrefundable Advance Jury Fees

3. a. *Party served:*
   b. *Person served:*

   Morgan Stanley & Co. LLC
   Valerie Villegas, Person Authorized to Accept Service, Hispanic, Female, 30 Years Old, Black Hair, Wearing Glasses, 5 Feet 6 Inches, 180 Pounds

4. *Address where the party was served:*

   C T Corporation
   818 W. 7th Street
   Suite 930
   Los Angeles, CA 90017

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Thu., Feb. 18, 2016 (2) at: 2:50PM
6. The "Notice to the Person Served" (on the Summons) was completed as follows:
   on behalf of: Morgan Stanley & Co. LLC
   Other: Limited Liability Company

7. *Person Who Served Papers:*
   a. L. Pacheco
   **b. Class Action Research & Litigation**
   P O Box 740
   Penryn, CA 95663
   c. (916) 663-2562, FAX (916) 663-4955

   Recoverable Cost Per CCP 1033.5(a)(4)(B)
   d. *The Fee for Service was:*
   e. I am: (3) registered California process server
      *(i)* Employee
      *(ii) Registration No.:*
      *(iii) County:*        Los Angeles

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

   *Date: Mon, Feb. 22, 2016*

| Attorney or Party without Attorney:<br>James I. Jaconette, Esq., Bar #179565<br>Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone No: 619-231-1058     FAX No: 619-231-7423 | For Court Use Only<br>F I L E D<br>SAN MATEO COUNTY<br>MAR - 1 2016<br>Clerk of the Superior Court<br>By _____ |
|---|---|

| Attorney for: Plaintiff | Ref. No. or File No.: |

Insert name of Court, and Judicial District and Branch Court:
San Mateo County Superior Court

Plaintiff: City of Warren Police & Fire Retirement System

Defendant: Natera, Inc., et al.

| **Proof Of Service**<br>**Summons; Complaint** | Hearing Date: | Time: | Dept/Div: | Case Number:<br>CIV537406 |
|---|---|---|---|---|

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of the Summons; Class Action Complaint; Civil Case Cover Sheet; Certificate re Complex Case Designation; Notice of Case Management Conference; ADR Information Sheet; ADR Stipulation and Evaluation Instructions; San Mateo Superior Local Complex Rules; Notice re Nonrefundable Advance Jury Fees

3. a. Party served:                              Wedbush Securities, Inc.
   b. Person served:                             Christine Hall, Person Authorized to Accept Service

4. Address where the party was served:          1000 Wilshire Blvd., 9th Floor
                                                Los Angeles, CA 90017

5. I served the party:
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Thu., Feb. 18, 2016 (2) at: 1:19PM

6. The "Notice to the Person Served" (on the Summons) was completed as follows:
   on behalf of:  Wedbush Securities, Inc.
   Under CCP 416.10 (corporation)

7. *Person Who Served Papers:*                                  Recoverable Cost Per CCP 1033.5(a)(4)(B)
   a. De' Andre Johnson                          d.  *The Fee for Service was:*
   b. **Class Action Research & Litigation**     e.  I am: (3)  registered California process server
      P O Box 740                                      *(i)*   Independent Contractor
      Penryn, CA 95663                                 *(ii)*  *Registration No.:*        140
   c. (916) 663-2562, FAX (916) 663-4955               *(iii)* *County:*              Los Angeles

8. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   Date: Thu, Feb. 18, 2016

   Judicial Council Form POS-010          Proof Of Service          _____
   Rule 2.150.(a)&(b) Rev January 1, 2007     Summons; Complaint          (De' Andre Johnson)
                                                                           jajac.154874

FILE BY FAX

| | | For Court Use Only |
|---|---|---|
| *Attorney or Party without Attorney:*<br>James I. Jaconette, Esq., Bar #179565<br>Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>*Telephone No:* 619-231-1058   *FAX No:* 619-231-7423 | | **F I L E D**<br>**SAN MATEO COUNTY**<br>MAR - 1 2016<br>Clerk of the Superior Court<br>DEPUTY CLERK |
| *Attorney for:* Plaintiff | *Ref. No. or File No.:* | |
| *Insert name of Court, and Judicial District and Branch Court:*<br>San Mateo County Superior Court | | |
| *Plaintiff:* City of Warren Police & Fire Retirement System | | |
| *Defendant:* Natera, Inc., et al. | | |

| **Proof Of Service**<br>**Summons; Complaint** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>CIV537408 |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Summons; Class Action Complaint; Civil Case Cover Sheet; Certificate re Complex Case Designation; Notice of Case Management Conference; ADR Information Sheet; ADR Stipulation and Evaluation Instructions; San Mateo Superior Local Complex Rules; Notice re Nonrefundable Advance Jury Fees

3. a. *Party served:*
   b. *Person served:*

     Natera, Inc.
     Gladis Aguilera, Person Authorized to Accept Service, Hispanic, Female, 30 Years Old, Brown Hair, 5 Feet 7 Inches, 135 Pounds

4. *Address where the party was served:*

     National Registered Agents
     818 W. 7th Street, Suite 930
     Los Angeles, CA 90017

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Tue., Feb. 23, 2016 (2) at: 2:50PM

6. The "Notice to the Person Served" (on the Summons) was completed as follows:
   *on behalf of:* Natera, Inc.
   Under CCP 416.10 (corporation)

7. *Person Who Served Papers:*
   a. L. Pacheco
   b. **Class Action Research & Litigation**
    P O Box 740
    Penryn, CA 95663
   c. (916) 663-2562, FAX (916) 663-4955

        Recoverable Cost Per CCP 1033.5(a)(4)(B)
  d. *The Fee for Service was:*
  e. I am: (3) registered California process server
    *(i)* Employee
    *(ii) Registration No.:*
    *(iii) County:*     Los Angeles

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

 *Date: Wed, Feb. 24, 2016*

                  (L. Pacheco)

FILE BY FAX

| Attorney or Party without Attorney:<br>James I. Jaconette, Esq., Bar #179565<br>Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>*Telephone No:* 619-231-1058    *FAX No:* 619-231-7423 | *For Court Use Only*<br><br>**F I L E D**<br>SAN MATEO COUNTY<br><br>MAR - 1 2016<br><br>Clerk of the Superior Court<br>By_____<br>DEPUTY CLERK |
|---|---|
| *Attorney for:* Plaintiff      *Ref. No. or File No.:* | |

| *Insert name of Court, and Judicial District and Branch Court:* |
|---|
| San Mateo County Superior Court |
| *Plaintiff:* City of Warren Police & Fire Retirement System |
| *Defendant:* Natera, Inc., et al. |

| **Proof Of Service**<br>**Summons; Complaint** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>CIV537406 |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Summons; Class Action Complaint; Civil Case Cover Sheet; Certificate re Complex Case Designation; Notice of Case Management Conference; ADR Information Sheet; ADR Stipulation and Evaluation Instructions; San Mateo Superior Local Complex Rules; Notice re Nonrefundable Advance Jury Fees

3. a. *Party served:*      Piper Jaffray & Co.
   b. *Person served:*      Gladis Aguilera, Person Authorized to Accept Service, Hispanic, Female, 30 Years Old, Brown Hair, 5 Feet 7 Inches, 135 Pounds

4. *Address where the party was served:*      C T Corporation
                                             818 W. 7th Street
                                             Suite 930
                                             Los Angeles, CA  90017

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Tue., Feb. 23, 2016 (2) at: 2:50PM
6. The "Notice to the Person Served" (on the Summons) was completed as follows:
   on behalf of:  Piper Jaffray & Co.
   Under CCP 416.10 (corporation)

7. **Person Who Served Papers:**                           Recoverable Cost Per CCP 1033.5(a)(4)(B)
   a. L. Pacheco
   b. **Class Action Research & Litigation**           d.   *The Fee for Service was:*
      P O Box 740                                     e.   I am: (3) registered California process server
      Penryn, CA  95663                                    (i)   Employee
   c. (916) 663-2562, FAX (916) 663-4955                   (ii)  Registration No.:
                                                           (iii) County:          Los Angeles

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

   *Date: Mon, Feb. 22, 2016*

| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | Proof Of Service<br>Summons; Complaint | (L. Pacheco)       *jajac.154872* |
|---|---|---|

## NOTICE OF CASE MANAGEMENT CONFERENCE

_City of Warren police, et al_

Case No: _CIV537409_

vs.

_Natera Inc, et al_

Date: _05/18/16_

Time 9:00 a.m.

**FILED**
**SAN MATEO COUNTY**
FEB 1 7 2016
Clerk of the Superior Court
By ___ DEPUTY CLERK

Dept. ___   --on Tuesday & Thursday
Dept. _21_   --on Wednesday & Friday

You are hereby given notice of your Case Management Conference. The date, time and department have been written above.

1.  In accordance with applicable California Rules of the Court and local Rules 2.3(d)1-4 and 2.3(m), you are hereby ordered to:

    a)  Serve all named defendants and file proofs of service on those defendants with the court within 60-days of filing the complaint (CRC 201.7).

    b)  Serve a copy of this notice, Case Management Statement and ADR Information Sheet on all named parties in this action.

    c)  File and serve a completed Case Management Statement at least 15-days before the Case Management Conference [CRC 212(g)]. Failure to do so may result in monetary sanctions.

    d)  Meet and confer, in person or by telephone, to consider each of the issues identified in CRC 212(f) no later than 30-days before the date set for the Case Management Conference.

2.  If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned. The Order to Show Cause hearing will be at the same time as the Case Management Conference hearing. Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.

3.  Continuances of Case Management Conferences are highly disfavored unless good cause is shown.

4.  Parties may proceed to an appropriate dispute resolution process ("ADR") by filing a Stipulation to ADR and Proposed Order (see attached form). If plaintiff files a Stipulation to ADR and Proposed Order electing to proceed to judicial arbitration, the Case Management Conference will be taken off the court calendar and the case will be referred to the Arbitration Administrator. If plaintiffs and defendants file a completed stipulation to another ADR process (e.g., mediation) 10–days prior to the first scheduled Case Management Conference, the Case Management Conference will be continued for 90-days to allow parties time to complete their ADR session. The court will notify parties of their new Case Management Conference date.

5.  If you have filed a default or a judgment has been entered, your case is not automatically taken off Case Management Conference Calendar. If "Does", "Roes," etc. are named in your complaint, they must be dismissed in order to close the case. If any party is in bankruptcy, the case is stayed only as to that named party.

6.  You are further ordered to appear in person* (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.

7.  The Case Management judge will issue orders at the conclusion of the conference that may include:

    a)  Referring parties to voluntary ADR and setting an ADR completion date;

    b)  Dismissing or severing claims or parties;

    c)  Setting a trial date.

8.  The Case Management judge may be the trial judge in this case.

For further information regarding case management policies and procedures, see the court's website at:  www.sanmateocourt.org

*Telephonic appearances at case management conferences are available by contacting CourtCall, LLC, an independent vendor, at least five business days prior to the scheduled conference (see attached CourtCall information).



**Superior Court of California**
**County of San Mateo**
**Civil Department**
**400 County Center**
**Redwood City, CA 94063-1655**
**(650) 261-5100**
**www.sanmateocourt.org**

| CITY OF WARREN POLICE AND FIRE RETIREMENT <br> Plaintiff(s) <br> vs. <br> NATERA, INC. | **Notice of Complex Case Status Conference** <br><br> Case No.: CIV 537409      Date: **04/19/16** <br><br> Time: **9:00 AM** <br><br> **Dept. 11** |
|---|---|

Title:   CITY OF WARREN POLICE, ET AL VS. NATERA INC. ET AL

You are hereby given notice of your Complex Case Status Conference.  The date, time and department have been written above.  At this conference, the Presiding Judge will decide whether this action is a complex case within the meaning of California Rules of Court ("CRC"), Rule 3.400, subdivision (a) and whether it should be assigned to a single judge for all purposes.

1.  In accordance with applicable **San Mateo County Local Rule 2.30**, you are hereby ordered to:
    a.  **Serve** copies of this notice, your Civil Case Cover Sheet, and your Certificate Re: Complex Case Designation on all named parties in this action no later than service of your first appearance pleadings
    b.  **Give reasonable notice** of the Complex Case Status Conference to all named parties in this action, even if they have not yet made a first appearance or been formally served with the documents listed in subdivision (a).  Such notice shall be given in the same manner as required for an ex parte application pursuant to CRC 3.1203.

2.  **If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned.  The Order To Show Cause hearing will be at the same time as the Complex Case Status Conference.  Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.**

3.  An action is provisionally a complex case if it involves one or more of the following types of claims: (1) antitrust or trade regulation claims; (2) construction defect claims involving many parties or structures; (3) securities claims or investment losses involving many parties; (4) environmental or toxic tort claims involving many parties; (5) claims involving massive torts; (6) claims involving class actions; or (7) insurance coverage claims arising out of any of the claims listed in subdivisions (1) through (6).  The Court shall treat a provisionally complex action as a complex case until the Presiding Judge has the opportunity to decide whether the action meets the definition in CRC 3.400(a).

4.  Any party who files either a Civil Case Cover Sheet (pursuant to CRC 3.401) or a counter or joinder Civil Case Cover Sheet (pursuant to CRC 3.402, subdivision (b) or (c)), designating an action as a complex case in Items 1, 2 and/or 5, must also file an accompanying Certificate Re: Complex Case Designation in the form prescribed by the Court.  The certificate must include supporting information showing a reasonable basis for the complex case designation being sought.  Such supporting information may include, without limitation, a brief

description of the following factors as they pertain to the particular action: (1) management of a large number of separately represented parties; (2) complexity of anticipated factual and/or legal issues; (3) numerous pretrial motions that will be time-consuming to resolve; (4) management of a large number of witnesses or a substantial amount of documentary evidence; (5) coordination with related actions pending in one or more courts in other counties, states or countries or in a federal court; (6) whether or not certification of a putative class action will in fact be pursued; and (7) substantial post-judgment judicial supervision.

For further information regarding case management policies and procedures, see the court website at www.sanmateocourt.org

* Telephonic appearances at Complex Case Status Conference are available by contacting CourtCall, LLC, an independent vendor, at least 5 business days prior to the scheduled conference.

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that I am the clerk of this Court, not a party to this cause; that I served a copy of this notice on the below date, by placing a copy thereof in separate sealed envelopes addressed to the address shown by the records of this Court, and by then sealing said envelopes and depositing same, with postage fully pre-paid thereon, in the United States Mail at Redwood City, California.

Date: 02/19/16

Rodina M. Catalano,
Court Executive Officer/Clerk

By: NIMA MOKHTARANI
Deputy Clerk

Copies mailed to:

JAMES I JACONETTE
655 W BROADWAY, STE 1900
SAN DIEGO CA 92101

Form: CCSC [Rev. Dec. 2014]